Harry D. Harry D. Harry, the United States Court of Appeals for the Eleventh Circuit is now open to court and to law. God save the United States and its Honorable Court. Please be seated. Good morning. Four cases again to hear this morning. Council, we're familiar with your cases. We've read your briefs, authority cited in your briefs. We've looked at least portions of the record. You don't have a lot of time this morning, so get straight to the heart of your argument. We're probably going to have some questions, but be mindful of the colored lights. When the red light shines, it is time to stop. If you're answering a question from the court, of course, you'll be on our time and you can finish your answer. But otherwise, please be respectful of our time. Our first case this morning is United States v. Davis. Mr. Lloyd. J.D. Lloyd for Johnnie Davis. May it please the court. I'd like to spend my time today talking about the geofence warrant in this case and how it violated Mr. Davis's Fourth Amendment rights. And there are two points that I'd like to focus on. First, Mr. Davis had standing to challenge the geofence warrant and the district court should have recognized that. Second, the district court's good faith analysis deferred too much to the government without first more seriously considering the constitutional concerns about such an incredibly broad law enforcement tool. But I'd like to take those issues in reverse order, if I may. In a recent case involving a relatively novel intersection of technology and the Fourth Amendment, this court noted from the outset that technology moves more quickly, the law moves more slowly, and the combination can leave law enforcement with little insight on how to proceed. While the same observation could be made and be said about geofence warrants, this court should recognize that there are old constitutional principles in the Fourth Amendment coupled with more recent rulings that point to the conclusion that this warrant violated the Fourth Amendment. And I'd kind of like to start in talking about the concept of the general warrant and the arguments that we made about the general warrant and just the incredible scope and breadth of what this geofence warrant... I don't see how your client had a privacy interest in someone else's phone and someone else's Gmail account. Well, we would direct the court to turn back to Carpenter and to think about what Carpenter was concerned with. And Carpenter was concerned with the movement that the individual made. And the record below was not particularly clear about... But Carpenter was about self-site location data that is attributable to records kept by the cell provider who has a contractual relationship with the subject of the warrant or the subject of... Those records, who's also the defendant, right? Right. This is the girlfriend. This is not your client. I don't understand how your client has a privacy interest in the girlfriend's Gmail account and cell phone. Yes, Your Honor. So in kind of keeping with the vein of Carpenter, thinking about what Carpenter looked at, the self-site location information, and thinking about what we're dealing with here in location history. Self-site information and location history are extremely similar in concept. And I think that this court should look at the two as almost the same sort of data and the same sort of information touching upon the same sort of privacy interest. And with that in mind, it's the movements that matter and who is moving that matters. I think that perhaps the Carpenter case wouldn't have come out differently if the record had shown that Carpenter had been borrowing his mother's cell phone for three weeks and that it was still his movements and his mother's phone connecting to the towers. And that was the information being dumped. And so in this similar situation here, we believe that it is Davis's movements. And while it might have been through his girlfriend's daughter's account on his girlfriend's phone, it's still Davis's movements. And that's what Mr. Davis argued all along was that these were his movements in question here. While it was someone else's phone and someone else's account transmitting the location history, it was, for all intents and purposes, still his movements. It was not his girlfriend's daughter's movements. We don't know exactly whose movements were being tracked, whether it was his or his girlfriend's, but Mr. Davis offered below that they were, in fact, his movements. If the geofence warrant led to information tracking the movements of his girlfriend, assume that the girlfriend was the one who was in possession of her own phone. And then that information led to your client. Would he have the ability to move to suppress? Well, we would still argue that it depends on the closeness of their movements. We would still argue that Mr. Davis has a privacy interest in the movements, and if they're moving in an identical fashion, that he would still have a privacy interest. But if there was clear delineation between whose movements, then yes, standing becomes much harder for us to prove, and that's a much higher burden for us to prove. But I do want to back up in the concept of standing to take a look at these Google warrants and to think about what the Google warrant is actually starting with. The Google warrant, based off of Officer Faggart's testimony, is that when Google initiates this warrant, it's looking through every single Google account in their system. It's not necessarily tied to the geographic locations where they're asking for this information. It's literally looking through every single Google account. That was Officer Faggart's information. We don't have a declaration in this case from Google. I don't understand why that would matter, though. Google can look at its own data if it wants to. It's when they turn it over to the police that it becomes a Fourth Amendment issue, right? Well, in this case, Mr. Davis wasn't a Google account holder. He did have Google accounts. That was part of the search that Officer Faggart conducted, was looking to see if there was any sort of information tied to, I believe, three different Gmail addresses that, through their investigation, connected to Mr. Davis. So, at the very inception of this search, before we even find out about the Yana Gmail address and its movements, we contend that Mr. Davis had standing because he, as a Google account holder's account, had to have been searched through this massive portal. Yeah, but if Google is searching it, though, I guess I don't. Let me ask you this, which is, I think, sort of related to the standing issue, but not the same question, is why would the police need a warrant? Why would we say that the police need a warrant to do this search at all, given that the geofence was for a public area? Well, again, while it was for a public area, it's still— And I'm not saying the police don't need one. I'm just saying think about, like, why we would say they did need one. I would say that, again, we look back to Carpenter and what happened in Carpenter. And, again, Carpenter was talking about the movements in a public space as well. And, again, we're talking about different durations, and that's kind of a separate issue. But, again, the court concluded in Carpenter that tracking these movements was akin to a search, especially in the way that the privacies of life— So let's say I have a video camera outside of my house that just, you know, records who drives past my house. If the police come to me and ask me to give them that video and it shows, you know, you or your client, like, walking down the street, you wouldn't have an expectation of privacy in that video, right? You wouldn't be able to quash—I'd say that the police need a warrant to get that or something, right? Right, and generally speaking, you wouldn't. So what makes this different from that? Now, there may be something. I'm just trying to figure out, like, what exactly it is. Well, I try to pull the court back to what exactly a geofence warrant is and what exactly it is requiring Google to do and what is Google doing on behalf of law enforcement. And, you know, I draw the analogy to—you know, I'd like to draw the analogy to the Ybarra case and think about what the court outlined in Ybarra and what is required as a particularized probable cause to search each individual patron of the bar in Ybarra. And, you know, as an example, I think that the court should look at in locations 1, 2, and 3 in the Google warrant here. They gave Google a specific GPS coordinate, and they asked for Google to look at a 100-meter radius from that point for specific time windows. I believe it was 30 minutes for the first two and 40 minutes for the third window. And I'd like the court to just think of how many accounts that potentially touched. Well, here's what I'm concerned about, not how many accounts, but how many accounts were your clients. And the answer to that is zero. Well, but that search, Your Honor, we believe touched at least three of Mr. Davis' accounts. None of which was used at this trial. Well, the information about his accounts were presented by—were part of the suppression hearing and were part of the investigatory process. How many of them were presented at this trial? Well, none were presented at this trial. Okay, so what does it matter? Well, we still maintain that, you know, to reach that threshold question of standing, that he had a privacy interest at the inception, at the beginning of this whole geofence process, that if this court just looks to what has resulted from the geofence process, it kind of ignores the massive scope about what this warrant actually does and what the process actually looks like to get down to that information that was ultimately used. Yeah, but, I mean, if the government has a search that would violate the Fourth Amendment and a magistrate judge suppresses the fruits of that search, you don't get to complain about it when no forbidden fruit is presented at trial. Right, but again, I turn back to, while this was the Ybarra account and logged onto another cell phone, we don't know who was in possession of the cell phone. And, again, we maintain that it was Mr. Davis' movements. So the device in the account that's logging that, we believe, is somewhat irrelevant to the calculus. Think about it this way, though. Assume that the police had conducted an illegal search of the girlfriend's house, violates the Fourth Amendment in one way, shape, or form. They take her phone. Again, a violation of the Fourth Amendment. They search the phone, a violation of the Fourth Amendment. And by searching the phone and its location data, et cetera, et cetera, they find out that, or they think they find out that your client was in certain locations, that the phone, sorry, that the phone was in certain locations at the same time, and they use that information to get to your client. Would he be able to move to suppress? If I may, I would say that I draw the line between answering the questions and what could be shown to show who actually possessed the gun. And if it's definitively shown that she possessed the phone but was moving in sync with him, that throughout this process, we would argue that he still has standing under- What if he stole it? What if he stole it? Well, there's a, I apologize, I don't remember the circuit, but in the Curie case involved the kidnapping and the cell tower data where he had his cell phone, he stole one of the victim's cell phones, but he didn't know that the victim had a second cell phone. And the court there concluded that he did have a privacy interest in the cell location information taken from the stolen cell phone. So even if it's stolen, it's still his movement, and that's what we kind of would pull the court back to. What court held? I believe it was the Curie case, Your Honor. What court held that? I'm sorry, I can't remember off the bat. I believe it's- A defendant who stole a phone and cell location data associated with the stolen phone, not his phone, had to be suppressed? Yes, Your Honor. Well, that he didn't have a privacy interest. The court ended up ruling that he didn't have the privacy interest in the phone that he didn't know about, but the phone that was his and that the phone that he stole, he did have a privacy- Well, I understand the phone that was his, but the court held that the phone that he stole, he had a privacy interest. Yes, Your Honor. Okay. It was the Curie- Well, I bet that's not an 11th Circuit case. It was not, Your Honor. I think that it was the 3rd or 2nd Circuit, but I'll double-check. Well, you've saved four minutes for rebuttal. Let's hear from Mr. Talley. Thank you. Chief Judge Pryor, Your Honors, may it please the Court, Brett Talley for the United States. And I do want to start for what we've been talking about this morning, the third-party problem. It's really the third-party cubed problem. This is a third-party's app on a third-party cell phone held by a third-party. And I think if the Court were to find that Mr. Davis has a cognizable privacy interest in that, what we used to call standing, that would upset a lot of this Court's Fourth Circuit or Fourth Amendment precedent. There's nothing like this in this circuit. There are cases that suggest outcomes, and if you use traditional expectation of privacy paradigms, you come to the conclusion that you're advocating for, which is there's no expectation of privacy here. But we've used those paradigms in other cases like our predecessor Davis, and the Supreme Court has turned us on our ear and told us that, you know, the new technology sort of upends things and doesn't let you apply the old precedents like the third-party provider line of cases automatically. So I get what you're saying, but we don't have anything in this area of law, nor does almost any other federal circuit court as far as I can tell. Well, I have a few things to say about that. First, Your Honor, I think you do, just not geofence warrants. I think tower dumps are something that happen all the time. When you have a tower dump, essentially what's happening is every phone. When you have a what, I'm sorry? A tower dump, a phone tower dump. Every phone that connects to that tower in that area is provided to law enforcement, and law enforcement can see who the subscribers are to that, and that's something that does not require a warrant. It's not a geofence, but it's very similar in the way it functions. The other thing I would say is you're absolutely right. In Carpenter, the Supreme Court did say when you have these emerging technologies, we need to take a little bit more of a look. But when you look at the facts of Carpenter, you see how different it is from this case. First of all, Carpenter, it was his cell phone, and it didn't track him for a handful of minutes in a handful of areas related to a specific crime. It tracked him for 127 days. Everywhere he went, everywhere he stayed, that was the concern of the court. And I think when you look at this case and you see how particular these searches are, you see the distinction there. And there's a couple of other factual things that I think are important. Number one, the way I read the record, there is no evidence that any account of Davis's was ever searched by Google, and I would direct the court to Agent Jay Burney's testimony in trial. It's document 224, volume 1 of the transcript, pages 113 and 115. He describes exactly how these geofence warrants work, and he talks about how Google has essentially mapped over 90% of all the Wi-Fi hotspots in this country. And when your phone, running a Google app, which, by the way, you have to opt into, attaches to one of those Wi-Fi spots, Google records it. And when they go to search, they look at all the hotspots in the area that is being searched, and they find all the phones that connect it. They don't have to run through every single cell phone that exists in the world to determine whether or not they were in that place. And there's no evidence that Davis's email address was ever even implicated in this. Let me ask you the thing that's bothering me about this is, so if I borrow my wife's phone, and I have it in my pocket, and the police come up to me, and they want to see if I have her phone in my pocket, I clearly have a reasonable expectation of privacy that prevents them from just, you know, taking my jacket off and pulling it out and looking at it, right? Why isn't that analogy mean the same thing here, that when this guy is walking around with his girlfriend's daughter's cell phone in his pocket, why doesn't he have a reasonable expectation of privacy that the government won't use some kind of surveillance system to find it in his pocket? Well, I think there are a couple things. Number one, Your Honor, in the case which you just described, the court is searching you to get that phone. In this case, and it's the girlfriend's phone, which is running an app of the dollars, is how they found the information. The other thing, if what they want the phone for is to track your movements, and they've been walking behind you the whole time, they already have that. And that's another important fact in this case. How did Google get the coordinates? Where did that information come from? Well, if you look at the affidavit to the search warrant, the officer tells you. They did exactly what Judge Brasher mentioned earlier. They pulled surveillance cameras. And those surveillance cameras showed that after the carjacking, they follow the car, they follow it backing into a parking place in front of the store that was robbed. They follow it as it's getting away. They see it being dumped. They see Davis running down an alleyway. They see him jump into this car. So as far as tracking his movements, his movements have already been tracked, once again, through a process that I don't think anyone says invades his privacy. In reality, this particular geofence warrant is really about identity. It's about who is that guy in that car, which may or may not change the entire calculus. Well, from your perspective it is, not from his. I mean, you want to find that identity to be able to charge and prosecute. But from the perspective of the person who's being surveilled, to use a very generic term, identity is not the sine qua non of the geofence warrant. It's the threat of constant surveillance by the government over a dragnet of people. Well, I guess, Your Honor, there's the general concern and there's the specific concern in this case. In this case, any concern he has about being surveilled, he has been surveilled. And he's been surveilled by cameras. As to the question, if this were to turn into an identity argument, the courts have been clear that when the prosecution offers information for purposes of identity, the Fourth Amendment doesn't really apply. But even putting that aside, the dragnet surveillance is not happening in this case. This is not a case where we have a geofence warrant over the entire city capturing every person's movements for days on end. This is a case... But your point would be it doesn't matter if it does that. Well... Because if the geofence warrant in this case was as broadly worded as you just suggested, and the facts on the ground were the same as those presented here today, and it was the girlfriend's phone and the girlfriend's daughter's app, your position would be exactly the same. There's no expectation of privacy, right? Well, two things. Number one, if it didn't capture any of his information, he would not have an expectation of privacy that he could raise in court. Correct. So your argument would be no harm, no foul. It's okay for us to run these geofence warrants and run them for the whole city of Birmingham. No problem. Your Honor, there might be a policy issue with that. No legal problem. No legal problem in a criminal case. No Fourth Amendment problem. No Fourth Amendment problem in a criminal case. As a matter of fact, if the geofence warrant was for the whole United States, you would make the same argument. In this particular criminal case, I would have to make that argument. Of course, of course you would. You would hold that line. But my point is only to say that your concern about identity in this case doesn't take away from a broader concern about surveillance of a whole host of people. Well, Your Honor, we can get into nightmare scenarios, but that is not the scenario in this case or in how Google does this. Okay, let's talk about this case and non-nightmare scenarios in your words. The warrant application, in case we get to the merits. First, I want to make sure I've got the record clear. The district court and the magistrate judge did not make any findings about the alteration issue, right? So if we get to the merits and we think that that might be a problem, that requires a remand for fact-finding about exactly what happened and under what circumstances. You're correct. The magistrate judge did not make a specific fact-finding that the agent did not change the face of the warrant in front of the judge. Correct. Okay. All right. The application for the warrant. There were two, and I understand that probable cause is not a high standard, but here there were two suppositions, right? The supposition number one, which was not proven by any evidence. It was just a supposition, was that because most people use cell phones and are addicted to cell phones, this robber must have had a cell phone, right? That is one of the suppositions, yes. And then supposition number two is that if he had a cell phone, it was somehow tied to Google in a way that Google would be able to figure out location data and track it if you issued a geofence warrant, right? That is correct. How does that establish probable cause? Well, I think there are a couple things I would say about that. Number one, the agent does say in his training experience that people who are involved in these kind of crimes tend to have cell phones with them. What does that mean? It means that in his training experience, this is what he sees. Does he provide any percentages? Does he provide any numbers? Are there any data? Or it's just like, hey, robbers have cell phones. You're telling me that bank robbers and Hobbs Act robbery individuals carry cell phones with them all the time so they can be looking at YouTube videos while they go about their business? You're telling me that there aren't people who don't do that way and don't fit that characteristic? Well, the answer to the first question is yes, they absolutely do, Your Honor. It amazes me too. I'm sure that some do. And there are some that don't. Because you're talking about probabilities. And so what does this agent say? Does he provide any data, any experience? I've been doing this for 20 years, 15 years, 10 years. I've investigated, you know, 25 of these robberies and 18 of them and 17 of them and 14 of them. The robber had a cell phone. Or is it just like, listen, trust me, I know. Well, he doesn't provide specific numbers, but he talks about investigating terrorism and violent crime and these kind of crimes. And that in those crimes, oftentimes people will use cell phones not just to watch YouTube videos but to communicate with each other. Remember, at this stage in the investigation, we don't know it's just Johnny Davis. The district court credits that testimony? Yes. So our review is for clear error about that fact? Yes, Your Honor. And the other thing I would say about this is there's an irony here to talk about how cell phones, everybody has one, we have them all the time, and we have to worry about this nightmare world where we're going to be monitoring everyone. To the extent that the Supreme Court in Raleigh is talking about aliens coming down and seeing people with a cell phone and thinking it's part of our body, on the one hand, but on the other hand, not crediting what the agency says. If the aliens come down, the phones aren't going to be our problem. Well, that is true. That is true, Your Honor. Though maybe they'll like the phones and they'll take them. All right, second supposition. Second supposition is that there's a likelihood that if this guy or gal had a cell phone while he was committing one or more of these robberies, it was somehow tethered to Google so that issuing a geofence warrant to Google would give us information that would help us with the investigation of this offense. Correct, Your Honor. Where does that come from? There is a supposition that one of the many, many thousands of apps, including some of the most used apps on phones, Google Maps, for instance, would be on the phone. And I will just note, as you've said, it's probable cause. It's not 100% sure. It's not beyond a reasonable doubt. If we had to know for a fact that there would be evidence. It's not even preponderance. It's not even preponderance of the evidence. It just has to be a reasonable conclusion. All these suppositions you've mentioned, I think, are perfectly reasonable in this day and age, I think that's why we're here arguing about geofence warrants. It's because we recognize how pervasive they are. And for the agent to rely on that, I think, is not unreasonable. Okay. Question number three. The geofence warrant provides a multi-step process at which the court lets go and the government takes over once Google provides the first tranche of information. Correct. Tell me how that's proper. So there are a few things on that. Number one, the judge approved it. The judge knew that was going to happen. This is not a good faith issue. I'm not addressing that. Regardless of what happened here, the judge issued a warrant. That has consequences, right? But once Google releases the first tranche of information, it's the government that tells Google what to do next and then what to do next and then what to do next. That seems odd. Well, there are a couple things I would say about it. Number one, the government is telling them what to do from the very beginning. They're telling them what to search. The second point I would make, the point of the three-step process, which was developed by Google as part of this geofence warrant requirement, which we don't even think is required, but Google does require, is to protect privacy. The point of the exclusionary rule is to encourage law enforcement to protect privacy. The three-step process does that because that first step, when they send out that information, it's all anonymized, and by allowing the government to come back and provide additional information, you eliminate a lot of anonymized data of people who might be concerned about the very thing you were pointing out, about some dragnet-style surveillance. So that step is actually protecting privacy, not impinging upon it. My point is not about whether or not this is good or bad, but that it's the government and not the judge deciding what happens at steps two, three, and four of the process. And that is what seems odd to me. And I can understand that, Your Honor. And as we have said from the very beginning of this argument, this is a unique and developing technology, and we are developing new ways to protect people's privacy while using it. So I understand that it seems strange, but the judge approves it in the first instance, and until step three, when three users' information was unmasked, there's actually no privacy of anyone being impinged because no actual information is being revealed. Any questions? Not anymore. Thank you, Your Honor. Thank you, Mr. Talbot. Mr. Lloyd. I'll take four minutes. I'd kind of like to build off of what Judge Jordan, you were just asking Mr. Talley about and talking about the scope of this warrant and talking about just kind of, in our opinion, the total abdication of. I'm not too concerned about the scope, if we get to the merits. I'm not too concerned about the scope of the geofence warrant. My concerns were on the probable cause side and on the government essentially taking over, and those are my words, not anybody else's, steps two, three, and four of the process once Google provides the first tranche of information. Sure, and probably scope was the wrong word to choose there. But talking about steps one, two, and three, what was set in motion within the four corners of that warrant, I think that when we're looking to the good faith issue and we're talking about the four prongs, we want the court to zero in on prongs two, three, and four and talking in particular about the judicial abdication of its gatekeeping function with this warrant. As Your Honor pointed out, once the government got this warrant, it was up to the government to decide where to go from here. And I think that it's worthwhile for this court to contrast this geofence warrant and the concepts of continuing probable cause and particularity with other geofence warrant cases that have been decided by some of the district courts or magistrate courts across the country. And in particular, I draw the court to the geofence analysis in the Ryan case, talking about how once they went through the step one dump and they got this anonymized list of people that they think were the potential suspects and the offenses there, they went back to the magistrate and made an additional showing of probable cause to say, we believe these people have committed these offenses based off of our analysis of the data that was returned from Google and we would like a warrant directing Google to turn over now the specific information about these users. I think that that is a very reasonable step. I mean, again, we're talking about a tool that is incredibly powerful and incredibly broad. And whether or not we're talking about the Google search looking into just users with location history enabled or we're talking about all Google users, we're talking about an incredible look into the lives of not just Americans but people around the globe as their data is stored on Google. And when we're talking about particularity and probable cause and the good faith analysis and looking at what the officer should have known or what the magistrate should have done, we can see in there very reasonable steps that, again, as I started off with, don't necessarily harken back to what new technology is dictating but what old Fourth Amendment cases and precedent talk about in the requirements of particularity, in the requirements of individualized probable cause. Here, once they got that data dump, they didn't go and seek another warrant to continue that search into the information that would reveal potentially who these three suspects or who these three accounts were tied to. They arguably would have developed probable cause, further probable cause through that. They had more that they could have shown a magistrate to get a warrant to make that further invasion of privacy and to further their investigation. And I think that that's important when we're looking at, again, prongs two, three, and four, about what a magistrate or what a judge and the gatekeeping function, what should have happened there and then what an officer should have realized and what an officer should have had in mind as they were pursuing this warrant. And if there are no further questions, then I'll spend my time back to the court. Thank you, Mr. Roy. Thank you, Your Honor. Thank you. Hey, Mr. Lloyd, I note that you were CJA appointed. We appreciate you accepting the appointment. Yes, Your Honor.